# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
April 29, 2009 Session

## STATE OF TENNESSEE v. DONOVAN MICHAEL MUNROE

**Appeal from the Criminal Court for Sullivan County**
**No. S52,456    Robert H. Montgomery, Jr., Judge**

--------

**No. E2008-00129-CCA-R3-CD - Filed June 18, 2010**

--------

The Defendant, Donovan Michael Munroe, appeals from his jury convictions in the Sullivan County Criminal Court for attempted second degree murder, possession of .5 grams or more of cocaine with the intent to sell, both Class B felonies, possession of oxycodone with the intent to sell, a Class C felony, and maintaining a dwelling where drugs are sold, a Class D felony. The trial court imposed Range I sentences of twelve years, eight years, three years, and two years, respectively; the trial court also ordered the sentences for the drug-related offenses to be served concurrently with one another and on supervised probation, but consecutively to the twelve-year sentence of incarceration for attempted second degree murder. In this appeal as of right, the Defendant contends that (1) the trial court erred in denying his motion to suppress evidence, (2) the trial court erred in admitting evidence seized in Virginia, (3) the trial court improperly limited the examination of witnesses, (4) the State committed prosecutorial misconduct in its closing arguments, (5) the trial court imposed an excessive sentence, and (6) the cumulative effect of these errors deprived the Defendant of due process and a fair trial. Following our review, we conclude that the fines imposed were excessive and order them modified consistent with this opinion. Accordingly, the judgments of the trial court are affirmed in part, reversed in part, and the case is remanded.

**Tenn. R. App. P.  3 Appeal as of Right; Judgments of the Criminal Court are Affirmed in Part; Reversed in Part; Remanded.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and NORMA MCGEE OGLE, J., joined.

Frank L. Slaughter, Jr., Bristol, Tennessee, attorney for appellant, Donovan Michael Munroe.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; H. Greeley Welles, Jr., District Attorney General; William B. Harper and Lewis Combs, Assistant District Attorneys General, attorneys for appellee, State of Tennessee.

## OPINION

Although the Defendant does not dispute the sufficiency of the evidence to support his convictions, a brief recitation of the facts is necessary for a full consideration of the issues presented on appeal. Bristol, Tennessee authorities were dispatched to a reported shooting at the Defendant's residence sometime after 9:00 a.m. on July 31, 2006. Patrol Officer Keith Feathers testified that he arrived to find the victim, Eian Harris, sitting in the front yard of the residence in a dazed condition, short of breath, and suffering from a gunshot wound to the right side of his back. Officer Feathers secured the scene and waited for the ambulance service to arrive to care for the victim. Bristol Fire Department paramedic Tim Estes testified that he arrived at the scene at 9:14 a.m. and immediately began treating the victim for a bullet wound to his back. He recalled that the victim also had two small cuts on his chest. He stated that the victim was delivered to the hospital via rapid transport by 9:28 in the morning.

Kerry-Ann Dixon testified that she was the victim's girlfriend. She stated that she and the victim had traveled from New Jersey the day before so that the victim could attend court for a speeding ticket. She testified that the victim knew the Defendant from their hometown in New Jersey and that the victim asked the Defendant if they could stay overnight so that he could attend court the following day. She and the victim spent the night in one of the bedrooms, and the victim woke up to go to court the next morning, leaving her asleep in the bedroom. She awoke to hear the Defendant and another friend, Kevin McNeish, discussing that some of the Defendant's money was missing from the previous night. She overheard the Defendant threatening to kill the victim if he did not return the money. Ms. Dixon testified that the Defendant asked her if she had taken the money and that she denied any knowledge of it.

Ms. Dixon recalled that once the victim returned from court, the Defendant began walking around the house carrying a gun wrapped in a washcloth. She said that the Defendant threatened them both and despite repeated offers made by the victim for the Defendant to search their bags, the Defendant never looked in their belongings for the money. Because they were preparing to leave, Ms. Dixon went outside to wait for the victim. She waited about five minutes then saw the victim open the door almost instantaneous to hearing a gunshot. She recalled that the victim had a shocked look on his face as he came through the door. She also recalled that Mr. McNeish had a knife in his hand so she ran from the yard. Ms. Dixon was able to flag down the police for help while she held the victim's

-2-

wound to control the bleeding. She stated that the victim spent two weeks in the hospital recovering from his injuries.

On cross-examination, Ms. Dixon stated that the victim had collected his belongings from another address in Bristol where he had lived for several months prior to returning to New Jersey. She stated that the victim had worked for and lived with Jamel Frances when he had lived in Bristol. She also acknowledged seeing the Defendant's money on the kitchen table the night before, but she denied seeing any drugs at the residence.

Eian Harris, the victim, testified that he was a native of Jamaica but had lived in New Jersey since March 2006. He met the Defendant through his ex-wife's son, who was friends with the Defendant in New Jersey. He stated that the Defendant gave him and Ms. Dixon a place to stay the night before his court date for a speeding ticket. While in court, the Defendant telephoned the victim and told him to return to the house because some money was missing. When he returned to the house, the Defendant was walking around with a gun in his hand. The victim told the Defendant that he could search their bags for the money but the Defendant "didn't do nothing more than mumbling with the gun walking around." The victim began to leave the house thinking that everything was all right between himself and the Defendant. He recalled that as he turned to leave, he heard Mr. McNeish say "hey" and turned to see the Defendant aiming the gun at him. He recalled that there was no "tussle" or altercation prior to the shooting. He said that as he lay on the lawn of the Defendant's residence, he saw the Defendant leave in Mr. McNeish's Jeep.

On cross-examination, the victim denied seeing the money the night before the shooting. He also denied that he had been drinking or had brought a gun to the house. He stated that he required two surgeries to repair damage to his lungs from the shooting and that he still suffered some residual lung damage. The victim admitted that the Defendant loaned him one hundred dollars to pay his speeding ticket fine.

Bristol, Tennessee Police Department Captain Charlie Thomas testified that he responded to the call of the shooting to find the scene secured and the victim being treated. He obtained and executed a search warrant of the residence. The search uncovered a spent .40 caliber shell casing that appeared to have been fired from a Glock handgun. Authorities also recovered a .32 caliber Smith and Wesson revolver which Captain Thomas described as a "piece of junk" that probably would not fire. When the search for evidence related to the shooting uncovered items related to drug activities, the authorities obtained a second search warrant for drug-related evidence. They found baggies containing cocaine, pills, a scale, money, and documents belonging to the Defendant, Mr. McNeish, and Mr. Frances in the residence.

-3-

Captain Thomas testified that Ms. Dixon gave the authorities the Defendant's cellular telephone number. After the investigators left several voicemail messages for the Defendant, the Defendant contacted the investigators and told them he would talk to them that afternoon at the jail. After failing to show, the Defendant was arrested later that night when he returned to the home. Upon his arrest, Captain Thomas obtained a Miranda waiver from the Defendant and took his statement. Captain Thomas also recovered from the Defendant a room key for the La Quinta Inn in Bristol, Virginia. After obtaining a search warrant with the assistance of Virginia authorities, the investigators recovered a substantial amount of cocaine, thirteen thousand dollars, the Defendant's driver's license, and a .40 caliber Glock handgun from the room. They also learned that the motel room was registered to Mr. Frances. Susan Canter, the former officer manager of the La Quinta Inn, testified that there was only one room key issued for the room rented in Mr. Frances' name.

Investigator Eddie Nelson with the Bristol, Tennessee Police Department Street Crimes Unit testified consistently with Captain Thomas regarding the drug-related items found at the Defendant's residence. He also testified that the discovery of the scales and packaging of the cocaine in small baggies indicated that the drugs were for resale and not for personal use. Investigator David Varble of the Bristol, Virginia Police Department testified that he assisted Tennessee authorities in uncovering the large amount of cocaine found in the motel room. He testified that the cocaine weighed approximately one hundred and twenty grams with a value of twelve thousand dollars. He stated that the drug evidence was kept for prosecution in Virginia but that he gave the Glock handgun to Captain Thomas for use in the Tennessee prosecution.

Diane Catley of the Virginia Department of Forensic Science testified that she analyzed over one hundred twenty grams of cocaine recovered from the La Quinta Inn motel room. Ashley Cummings of the Tennessee Bureau of Investigation (TBI) Crime Lab testified that her analysis of the substances recovered from the Defendant's residence confirmed two grams of cocaine and oxycodone pills. Kendra Fleenor of the TBI Crime Lab testified that no identifiable fingerprints were found on the Glock handgun or magazine cartridge. She also stated that she was not asked to analyze the baggies or pill bottle for any latent fingerprints. Teri Arney, a firearms expert with the TBI Crime Lab, testified that the bullet recovered from the victim had markings consistent with the Glock handgun recovered at the motel but that there was no conclusive identification due to the nature of rifling created by Glock handguns.

Dr. Glenn Pennington, a thoracic surgeon with the Bristol Regional Medical Center, testified that the victim suffered a bullet wound to the right side of his back that traveled through his lung to rest near his sternum. Upon arrival at the hospital, the victim had a

partially collapsed lung and some injury to his liver. Dr. Pennington described the victim's injuries as quite severe, requiring a blood transfusion and two surgeries.

The Defendant presented the testimony of Frank Brooks, who stated that he worked at Beachwood Auto at about the same time that the victim resided nearby in Bristol. He stated that his .40 caliber Glock handgun was stolen sometime in February 2006. Kevin McNeish testified that he was staying with the Defendant on the day of the shooting. He denied hearing any threats or yelling exchanged between the Defendant and the victim that morning. Mr. McNeish admitted that he pled guilty to drug offenses and accessory after the fact for his involvement in the incident at the Defendant's house. He stated that the drugs found at the residence were his but that he had no knowledge of the drugs found in Virginia. Amanda Chevannes, the Defendant's girlfriend of five years, testified that the Defendant is a truthful and peaceful person, although she admitted that she had no knowledge of the Defendant's actions in Tennessee.

The Defendant testified that he never threatened the victim or anyone else on the morning of the shooting. He stated that the victim became angry and told the Defendant to search their bags so that they could leave. He admitted that he never searched the bags. He testified that the victim approached him while motioning at his waist as if to indicate that he had a gun. The Defendant said that the victim drew the handgun to his face and pushed him toward the refrigerator. In an effort to defend himself, the Defendant grabbed the gun and it went off. The Defendant said that the victim ran outside and that Mr. McNeish told the Defendant to get out of the house so they fled in the Jeep. He stated that he picked up the gun with a plastic bag but that he did not wipe it down to remove any fingerprints. He testified that he was afraid that the situation would worsen if he remained at the house. The Defendant admitted that he went to the La Quinta Inn to Jamel Frances' room; he stated that Mr. Frances was his uncle. The Defendant also admitted that some of the oxycodone found at his house was for his personal use because he had "a pill problem." On cross-examination, the Defendant admitted that he told Captain Thomas that he was mad and "cussing" at the victim on the morning of the shooting but explained that he only said that because he was afraid and felt pressured when he gave his statement.

Based upon this evidence, the jury convicted the Defendant of attempted second degree murder (a lesser included offense of the indicted charge of attempted first degree murder), possession of more than .5 grams of cocaine for resale, possession of oxycodone for resale, maintaining a dwelling where drugs are sold, and aggravated assault. At sentencing, the trial court merged the aggravated assault conviction into the conviction for attempted second degree murder.

**ANALYSIS**

We initially note that the Defendant failed to file a timely motion for new trial in this case. The record reflects that the judgments were entered on September 5, 2007. The motion for new trial was filed on October 26, 2007, three weeks past the thirty-day filing deadline. Nevertheless, the trial court heard the motion for new trial and denied it on December 14, 2007. The Defendant filed a notice of appeal from this denial on January 11, 2008.

The thirty-day filing deadline of a motion for new trial is mandatory, jurisdictional, and may not be extended. Tenn. R. Crim. P. 45(b); State v. Martin, 940 S.W.2d 567, 569 (Tenn. Crim. App. 1997). Consequently, "[a] motion for new trial which is not timely filed is a nullity." State v. Dodson, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989). Subsequent review or considerations by the trial court or agreements of parties to hear a late-filed motion will not validate the motion for the purposes of appellate review. Id.; State v. Davis, 748 S.W.2d 206 (Tenn. Crim. App. 1987). Failure to file a timely motion for new trial will result in the waiver of all appellate issues that would result in the granting of a new trial. Dodson, 780 S.W.2d at 780; State v. Williams, 675 S.W.2d 499 (Tenn. Crim. App. 1984). Therefore, the issue regarding sentencing may still be reviewed. However, the remaining issues are limited to plain error review. See Tenn. R. App. P. 36(b).

While these issues may be reviewed via plain error, we note that Rule 4(a) of the Tennessee Rules of Appellate Procedure still requires the filing of a notice of appeal within thirty days of the entry of judgment or, pursuant to Rule 4(e), the entry of an order denying motion for new trial. Because the Defendant's motion for new trial was a nullity, it did not toll the thirty-day period for filing the notice of appeal. Therefore, the notice of appeal in this case was also untimely. See, e.g., State v. Patterson, 966 S.W.2d 435, 440 (Tenn. Crim. App. 1997); Davis, 748 S.W.2d at 207. The timely filing of a notice of appeal is not a prerequisite to the jurisdiction of this court, and this court may waive the requirement in the interest of justice. Tenn. R. App. P. 4(a).

However, this court has warned "the bench and bar alike should be on notice that there is no automatic appeal of these issues to this [c]ourt." State v. John A. Turbyville, No. E2002-00629-CCA-R3-CD, 2003 WL 21983022, at *1 (Tenn. Crim. App. Aug. 21, 2003). In order to secure review of issues raised by the Defendant, a timely filed notice of appeal must occur, or a waiver of the timely filed notice of appeal must be sought and obtained in this court.

In State v. Heather Massengill, No. E2006-02602-CCA-R3-CD, 2008 WL 2019462 (Tenn. Crim. App. May 12, 2008), this court dismissed the appeal due to the untimely motion for new trial and notice of appeal and the failure of the defendant to seek a waiver of the

-6-

timely notice of appeal. Unlike the defendant in Massengill, the Defendant in this case concedes that the motion for new trial was filed untimely,[1] rendering the notice of appeal untimely as well, and asks this court to waive the timely filing of the notice of appeal in order to review his waived issues pursuant to plain error and to review his sentencing issues. Because we choose to waive the timeliness of the notice of appeal, we shall address the propriety of the trial court's sentencing following our determination of whether any of the remaining issues merits plain error review.

Pursuant to the plain error doctrine, "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of an accused at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). In determining whether plain error review is appropriate, the following factors must be established:

(a) The record . . . clearly establish[es] what occurred in the trial court;
(b) a clear and unequivocal rule of law [has] been breached;
(c) a substantial right of the accused [has] been adversely affected;
(d) the accused did not waive the issue for tactical reasons; and
(e) consideration of the error is "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). On appeal, the defendant has the burden of establishing that these five factors are met. State v. Gomez, 239 S.W.3d 733, 737 (Tenn. 2007) ("Gomez II") (citing State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007)). The appellate court need not consider all five factors if any single factor indicates that relief is not warranted. Smith, 24 S.W.3d at 283.

*Suppression of Drug-Related Evidence*

The Defendant contends that the trial court erred in denying his motion to suppress evidence of drug activity discovered at his residence. He argues that the seizure of the drug-related evidence exceeded the scope of the search warrant which sought items related only to the shooting. The record reveals that Bristol, Tennessee authorities executed an initial search warrant of the Defendant's residence in search of evidence related to the shooting. During the course of the search, the authorities discovered evidence of drug-related activities in the kitchen area – in areas where weapons or ammunition may have been found. The search ceased, and the scene was secured. The investigators obtained a second search

---

[1] Counsel explained in an affidavit to this court that he believed that the motion for new trial had been timely filed by an associate of his firm.

warrant referencing drug-related evidence. The drug-related evidence was seized pursuant to the subsequent warrant.

Based upon this proof, the trial court denied the Defendant's motion to suppress. The trial court specifically found that the officers "had a legitimate basis to go into the places that [they] went into" when executing the first search warrant to investigate the shooting. The trial court further found that the officers had "the right to search in the places that [they] searched" and that much of the evidence related to drug activity could have been seized under the plain view doctrine even absent the issuance of the subsequent search warrant.

"In its most general terms, the plain view doctrine allows law enforcement officials to seize items in 'plain view' while executing a search warrant naming other objects." State v. Andrew William Byers and Larry Wayne Key a/k/a/ Larry Wayne King, No. 01C01-9601-CC-00002, 1997 WL 488621, op. at *8 (Tenn. Crim. App. Aug. 22, 1997), perm. app. denied (Tenn. Apr. 27, 1998) (citing Coolidge v. New Hampshire, 91 S. Ct. 2022 (1971)). Similar to this case, this court in Byers upheld the seizure of items in plain view found during the execution of a search warrant seeking evidence of an unrelated offense; the items lead to the issuance of a subsequent search warrant for further evidence related to the newly discovered offenses. Id. at *9. Accordingly, we conclude that a clear and unequivocal rule of law has not been breached because the trial court did not err in denying the motion to suppress.

*Admission of Evidence Related to Virginia Offenses*

The Defendant contends that the trial court erred by denying his pretrial motion to exclude from the trial the evidence of drug activity discovered in the La Quinta Inn in Bristol, Virginia. The State argues that this issue does not merit plain error review because no clear and unequivocal rule of law was breached by the admission of the evidence since the admission of evidence is a discretionary function of the trial court.

The State argues and we acknowledge that this court has held that "rarely will plain error review extend to an evidentiary issue," State v. Ricky E. Scoville, No. M2006-01684-CCA-R3-CD, 2007 WL 2600540, at *2 (Tenn. Crim. App. Sept.11, 2007), because there is often an inadequate record to facilitate appellate review due to trial counsel's failure to contemporaneously object to the admission of evidence. See, e.g., State v. John Britt, No. W2006-01210-CCA-R3-CD, 2007 WL 4355480 (Tenn. Crim. App. Dec. 12, 2007), perm. app. denied (Tenn. Apr. 28, 2008). However, in this case the record clearly establishes what occurred concerning this issue, and, as previously explained, we are constrained to review for plain error due to counsel's failure to file a timely motion for new trial.

The record reflects that the Defendant filed a pretrial motion to exclude all references to the cocaine and money seized from the Bristol, Virginia motel room on the basis that such evidence was unduly prejudicial under Rules 401 and 403 of the Tennessee Rules of Evidence. At the hearing on the motion, the State argued that the evidence should be admitted as part of a continuing course of conduct that the Defendant moved evidence from the residence in Tennessee and deposited the cocaine and money in the motel room in Virginia. The State contended that the cocaine and money were relevant to show that the Defendant possessed the cocaine found in the residence for the purpose of selling, and not for personal use. The Defendant insisted that the prejudicial effect of the evidence substantially outweighed its probative value and should be excluded pursuant to Rule 403.

The trial court noted that the Defendant "left [the scene] immediately after the shooting," possessed the only key to the motel room, and was present when the room was rented. The court ruled that "the gun would be relevant because obviously it's alleged to have been the attempted murder weapon." Regarding the cocaine, the trial court ruled that "[i]f there is a quantity of cocaine that was also found at the motel room that was rented right after this shooting took place it would seem to me that that would be relevant as to whether or not [the Defendant] possessed cocaine" that was found in the residence for resale. The trial court also ruled that evidence of the money recovered from the motel room was relevant to the Defendant's statement that the shooting occurred because of an argument over missing money. The trial court denied the Defendant's motion, finding that

> the probative value of those items found in that motel room, the defendant having the only key and his leaving [the scene] immediately after the offense occurred, that there is a sufficient nexus and the probative value of those things far and away outweighs the prejudicial effect.

Tennessee Rule of Evidence 401 provides that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Generally, relevant evidence is admissible, while irrelevant evidence is inadmissible. Tenn. R. Evid. 402. However, relevant evidence may be excluded if its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. "The admissibility of evidence under Rule 403 of the Tennessee Rules of Evidence is a matter within the trial court's discretion and will not be reversed on appeal absent an abuse of that discretion." State v. Biggs, 218 S.W.3d 643, 667 (Tenn. Crim. App. 2006) (citing State v. Dubose, 953 S.W.2d 649, 652 (Tenn.1997)).

We agree with the trial court that the evidence of cocaine and money recovered in the Virginia motel room was probative to show that the Defendant possessed the cocaine found in his residence with the intent to sell. However, the investigators confiscated over seven hundred dollars, scales, and baggies at the Tennessee residence; this evidence also points to the same conclusion that the cocaine was possessed with the intent to sell. In that respect, the evidence from Virginia was somewhat cumulative. The investigation further revealed that the Glock handgun recovered at the motel room was the weapon used in the shooting. The Defendant was in possession of the only key to the motel room. Therefore, we agree that the evidence was relevant to the offenses committed in Tennessee and that the probative value of this evidence was not substantially outweighed by the danger of unfair prejudice.

Furthermore, assuming for the sake of argument only that the contested evidence was improperly admitted by the trial court, we cannot conclude that a substantial right of the Defendant has been adversely affected by its admission. The evidence in this case is sufficient to convict the Defendant of attempted second degree murder and the drug offenses, even without the disputed evidence. Thus, because a clear and unequivocal rule of law has not been breached and a substantial right of the accused has not been adversely affected, this allegation does not merit plain error review.

*Limitation of Witness Examination*

The Defendant contends that the trial court improperly limited his questioning of two witnesses, Detective David Varble and Frank Brooks. He contends that he should have been allowed to cross-examine Detective Varble regarding charges pending against Jamal Frances related to the cocaine found in the Virginia motel room. He also asserts that he should have been allowed to ask Mr. Brooks whether the victim, Eian Harris, could have stolen Mr. Brooks' Glock handgun in February 2006. The State contends that the trial court did not unduly restrict the examination of these witnesses and that the Defendant was able to elicit some of his desired information; therefore, this issue does not merit plain error review.

Concerning the limitation of the cross-examination of Detective Varble regarding charges pending against Mr. Frances arising from the cocaine recovered in the motel room, the trial court ruled that

> you can cross examine [Detective Varble] about whether or not he thinks that other people are involved, but you can't ask him questions about whether or not charges have been filed. That's not relevant to this. I mean if your defense is, is that somebody else had these drugs and belonged to these drugs then you can ask him questions that might tend to show that somebody else was involved with or – but charges are not a relevant issue.

Trial counsel then established through cross-examination that the motel room was rented in Mr. Frances' name, not the Defendant's, and that Mr. Frances was a suspect in their investigation concerning the cocaine seized from the room. Detective Varble also testified that the Defendant made no telephone calls from the motel room.

Evidence that another person was charged with offenses concerning the drugs found in the motel room would have been relevant to show that someone other than the Defendant was involved in the possession of drugs for resale. However, we agree with the State that the evidence would not negate the Defendant's involvement. The record reflects that trial counsel effectively showed Mr. Frances' involvement without reference to the pending charges. Therefore, we conclude that any alleged error concerning the limitation of cross-examination would be harmless. See State v. Rice, 184 S.W.3d 646, 670 (Tenn. 2006). Accordingly, a substantial right of the Defendant has not been adversely affected and this issue does not merit plain error review.

Concerning the limitation of the direct examination of Mr. Brooks, Mr. Brooks testified during an offer of proof that he knew the victim and that the victim had been to his place of business before. He related that his .40 caliber Glock handgun was stolen from his residence sometime in February 2006. When asked if the victim knew about the gun, Mr. Brooks replied "possibly." However, he also testified that the victim never visited his home and that he could not recall if the victim was living in Bristol at the time the gun was stolen. The trial court limited the direct testimony and found that Mr. Brooks "was just speculating [, h]e just doesn't know" whether the victim was involved or even in Bristol at the time the gun was stolen. Before the jury, Mr. Brooks testified that he reported his Glock handgun stolen on February 11, 2006.

We agree with the trial court that the testimony sought from Mr. Brooks was too speculative. The jury heard testimony that a handgun similar to the one used in the shooting was stolen from Mr. Brooks. Accordingly, because no clear and unequivocal rule of law has been breached, this issue does not merit plain error review.

*Improper Closing Argument*

The Defendant argues that the prosecutor committed misconduct during closing argument by attacking the credibility of the Defendant when comparing the Defendant's testimony to "an octopus spraying ink in the water." As with the previously discussed issues, the Defendant asks this court to review this issue for plain error.

In determining whether the prosecutor's statements violated a clear and unequivocal rule of law, we first note that our supreme court has recognized that closing argument is a

-11-

valuable privilege for both the State and the defense and that counsel is afforded wide latitude in presenting final argument to the jury. See State v. Cribbs, 967 S.W.2d 773, 783 (Tenn. 1998); State v. Cone, 665 S.W.2d 87, 94 (Tenn. 1984). However, a party's closing argument "must be temperate, predicated on evidence introduced during trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Middlebrooks, 995 S.W.2d 550, 568 (Tenn. 1999). This court, citing to standards promulgated by the American Bar Association,[2] has identified "five general areas of prosecutorial misconduct": (1) intentionally misstating the evidence or misleading the jury as to inferences it may draw; (2) expressing the prosecutor's personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant; (3) using arguments calculated to inflame the passions or prejudices of the jury; (4) using arguments that would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused or by predicting the consequences of the jury's verdict; and (5) intentionally referring to or arguing facts outside the record unless the facts are matters of public knowledge. State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003) (citations omitted).

As relevant to this case, this court has held that the prohibition against the prosecutor's expressing an opinion regarding the truth or falsity of any testimony or evidence also "prevents the advocate from personally endorsing or vouching for [a particular witness or testimony]." Id. at 7. We do so because the testimony of "the witnesses must stand on their own." Id.

Following the Defendant's closing argument, the prosecutor began his rebuttal argument with this introduction:

> Ladies and gentlemen, there's a 19th century French writer by the name of Victor Hugo who wrote the novel Les Miserables which became the huge Broadway play. During the course of his writings he also wrote about an octopus, he wrote a description of an octopus and he describes the fact that an octopus doesn't have a beak, he doesn't have any claws, nothing to defend himself against [predators] that attack him. But what an octopus does have, as he describes, is an octopus has an ink bag and when an octopus feels threatened he releases ink into the water, darkens the water so that nothing can see around it. Sitting here listening to the defense in this case made a lot of similarities between that octopus and the defense that you've heard. Has the defense presented any real legitimate proof, any real legitimate defense to the

---

[2] See American Bar Association, ABA Standards for Criminal Justice: Prosecution Function and Defense Function §§ 3-5.8, 3-5.9 (3d ed. 1993).

-12-

charges in this case? No. What the defense has done is thrown a bunch of ink in the water.

The Defendant objected and argued that the prosecutor's remarks amounted to a shifting of the burden of proof. The trial court disagreed and ruled that the remark was not an improper statement of personal belief or opinion, but rather a comment that the Defendant's version of events was not supported by the evidence in the case. Nevertheless, the trial court agreed to give an immediate curative instruction reminding the jury that the remarks of counsel were not evidence.

Following our review of the record, we conclude that the prosecutor attacked the credibility of the Defendant's account of the events leading to the shooting by comparing the Defendant's account to the evidence presented by the State; the prosecutor in this case simply argued that the Defendant's account of the shooting was not credible because it was not supported by the evidence in this case. Accordingly, we conclude that the Defendant has failed to show that a clear and unequivocal rule of law has been breached. Therefore, this issue does not necessitate plain error relief.

*Sentencing*

Sentence Length

The Defendant argues that the trial court imposed an excessive sentence in length, manner of service, and imposition of fines. Relative to the length of his sentence, the Defendant contends that the trial court erred in four different aspects of determining his twelve-year sentence for attempted second degree murder: by enhancing his sentence based upon a prior criminal history consisting only of two prior non-violent misdemeanor convictions; by considering as criminal history the evidence found in the Virginia motel room; by finding that the Defendant was the leader in the commission of the attempted second degree murder; and by not applying certain mitigating factors and weighing the enhancement and mitigating factors appropriately. The Defendant also contends that the erroneous imposition of the maximum sentence precluded him from consideration for alternative sentencing. He alleges that the trial court should not have found him to be a dangerous offender for consecutive sentencing purposes because "[b]oth [drug offenses and attempted second degree murder] crimes carry more severe penalties because of the danger to people inherent in the crimes." Finally, the Defendant contends that the trial court imposed excessive fines for each conviction in light of his indigency and incarceration. The State contends that the trial court's sentencing decision comports with the purposes and principles of the 1989 Sentencing Act and, therefore, cannot be disturbed on appeal.

-13-

An appellate court's review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). As the Sentencing Commission Comments to this section note, on appeal the burden is on the Defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, the court may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991); see also State v. Carter, 254 S.W.3d 355 (Tenn. 2008).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> [T]he trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence.

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994) (citation omitted); see Tenn. Code Ann. § 40-35-210(e).

Tennessee's sentencing act provides:

(c) The court shall impose a sentence within the range of punishment, determined by whether the defendant is a mitigated, standard, persistent, career, or repeat violent offender. In imposing a specific sentence within the range of punishment, the court shall consider, but is not bound by, the following advisory sentencing guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c)(1)-(2).

The weight to be afforded an enhancement or mitigating factor is left to the trial court's discretion so long as its use complies with the purposes and principles of the 1989 Sentencing Act and the court's findings are adequately supported by the record. Id. § (d)-(f); Carter, 254 S.W.3d at 342-43. "An appellate court is therefore bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in . . . the Sentencing Act." Carter, 254 S.W.3d at 346. Accordingly, on appeal we may only review whether the enhancement and mitigating factors were supported by the record and their application was not otherwise barred by statute. See id.

In conducting its de novo review, the appellate court must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, (7) the defendant's potential for rehabilitation or treatment, and (8) any statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee. Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236-37 (Tenn. 1986).

At the sentencing hearing, the trial court made extensive findings regarding the enhancement and mitigating factors it found applicable to this case. The trial court specifically found as enhancement the Defendant's prior criminal history consisting of one misdemeanor theft and one shoplifting conviction, as well as the "sworn testimony" connecting the Defendant to the large amount of cocaine and money recovered in the Virginia motel room. Tenn. Code Ann. § 40-35-114(1). The trial court found that the Defendant was a leader in the commission of the offenses based upon the assistance Mr. McNeish provided the Defendant in fleeing the scene of the shooting with purported contraband, including the weapon. Tenn. Code Ann. § 40-35-114(2). The trial court also found as enhancement that the personal injuries inflicted upon the victim were particularly great and that the Defendant used a firearm during the offense. Tenn. Code Ann. § 40-35-114(6) and (9). The trial court examined the applicability of each statutory mitigating factor and those proposed by the Defendant and found that none applied. The trial court then imposed the maximum sentence of twelve years for the attempted second degree murder conviction. For the possession of cocaine, possession of oxycodone, and maintaining a dwelling where drugs are sold convictions, the trial court imposed minimum sentences of eight, three, and two years, respectively.

The Defendant argues that the trial court misapplied enhancement factors regarding his criminal history and leadership in the commission of the offense. However, we disagree. The trial court found applicable and placed great weight upon the Defendant's history of criminal convictions and criminal behavior, including the evidence of his involvement in the Virginia drug offenses, which the trial court found by a preponderance of the evidence. The evidence supports the finding of the trial court regarding this enhancement factor. State v. Carico, 968 S.W.2d 280, 287 (Tenn. 1998). The record also supports the trial court's finding that the Defendant was the leader in the commission of the offenses. Similarly, we conclude that the record supports the trial court's findings regarding mitigation.

The weight to be afforded an enhancement or mitigating factor is left to the trial court's discretion so long as its use complies with the purposes and principles of the 1989 Sentencing Act and the court's findings are adequately supported by the record. Carter, 254 S.W.3d at 342-43. Thus, the trial court's failure to give any weight to the Defendant's proposed mitigating factors cannot be reviewed by this court unless such failure exceeds compliance with the purposes and principles of the Act. In this case, we conclude that it does not. We further conclude that the trial court's imposition of a twelve year sentence is supported by the record in this case. Accordingly, there is no error in the denial of alternative sentencing because the Defendant was not eligible for alternative sentencing under the terms of his sentence.

## Consecutive Sentencing

In his brief, the Defendant makes a glancing challenge to the trial court's imposition of consecutive sentences. The trial court ordered the effective eight-year sentence for the drug convictions to be served consecutively to the sentence for the attempted second degree murder conviction based upon its finding that the Defendant qualified as a dangerous offender. Tenn. Code Ann. § 40-35-115(b)(4). The trial court made the additional findings that an extended sentence was necessary to protect the public against further criminal conduct by the Defendant and that the length of the sentence reasonably related to the seriousness of the offenses. State v. Wilkerson, 905 S.W.2d 933 (Tenn. 1995). We conclude that the record supports the imposition of consecutive sentences in this case.

## Fines

The trial court also imposed fines totaling $42,000 for the offenses in this case as follows: a fine of $10,000 for attempted second degree murder, a maximum fine of $25,000 for possession of cocaine with the intent to sell, a fine of $2,000 for possession of oxycodone with the intent to sell, and a maximum fine of $5,000 for maintaining a dwelling where drugs are sold. The Defendant contends that these fines are excessive in light of his indigency and

incarceration. In setting the fines, the trial court noted the large amount of money the Defendant had accumulated while in Tennessee, his ability to make bond pretrial, and his young age upon release. The trial court also considered the fact that the Defendant would be released to probation for the drug offenses following the service of the attempted second degree murder sentence in incarceration.

In State v. Taylor, 70 S.W.3d 717 (Tenn. 2002), our supreme court explained that

The trial court's imposition of a fine, within the limits set by the jury, is to be based upon the factors provided by the 1989 Sentencing Act, which include "the defendant's ability to pay that fine, and other factors of judgment involved in setting the total sentence." State v. Marshall, 870 S.W.2d 532, 542 (Tenn. Crim. App.1993). Trial and appellate courts must also consider other factors, including prior history, potential for rehabilitation, financial means, and mitigating and enhancing factors that are relevant to an appropriate, overall sentence. State v. Blevins, 968 S.W.2d 888, 895 (Tenn. Crim. App.1997). The seriousness of a conviction offense may also support a punitive fine. State v. Alvarado, 961 S.W.2d 136, 153 (Tenn. Crim. App.1996).

Id. at 723. In Taylor, the supreme court reduced a $27,500 fine for a conviction of driving on a revoked license. The court noted that Taylor had "a substantial history of prior criminal conduct and ha[d] a low potential for rehabilitation." Id. The court also noted, however, that Taylor's "lengthy incarceration also call[ed] into question [his] ability to pay a large fine." Id. In determining that the fine should be reduced, the supreme court stated that the "substantial period of incarceration" imposed by the trial court, along with the other considerations, lead to the court's conclusion that "a large punitive fine d[id] not appear necessary to achieve an appropriate overall sentence." Id.

Applying the same principles to this case, we note that the Defendant does not have a substantial criminal record. At the time of sentencing, he had previous convictions for shoplifting and misdemeanor theft in New Jersey. However, the Defendant did receive a substantial sentence of twelve years to be served in incarceration for the attempted second degree murder conviction followed by another eight years of probation for the drug offenses. The length of his incarceration calls into question his ability to pay the fines totaling $42,000 imposed in this case. Furthermore, the record does not support the trial court's assessment of the Defendant's ability to pay based upon the $13,000 he had presumably accumulated since living in Bristol – funds which the trial court noted were earned by other than legal means. In summary, as our supreme court concluded in Taylor, we deem the fines imposed in this case unnecessary "to achieve an appropriate overall sentence" in this case.

-17-

After carefully reviewing the record in this case in light of these applicable sentencing principles, we reduce the total fine to $18,000 as follows: $5,000 for attempted second degree murder, $5,000 for possession of cocaine with the intent to sell, $3,000 for possession of oxycodone with the intent to sell, and $5,000 for maintaining a dwelling where drugs are sold. We believe that this total "fine does not contravene the state and federal constitutional provisions prohibiting excessive fines because the fine is not disproportional either to the gravity of the defendant's offense[s] or to the culpability of the defendant." Id. (citations omitted).

CONCLUSION

Because we conclude that none of the Defendant's allegations merit plain error review, we further conclude that the Defendant's due process rights were not violated by any cumulative effect of the alleged errors. We also conclude that the trial court's sentencing decision comports with the principles and purposes of sentencing with regard to the length and manner of service of the sentences. However, we conclude that the fines imposed by the trial court were beyond that necessary "to achieve an appropriate overall sentence" and reduce them as previously discussed. Accordingly, the judgments of the trial court are affirmed in part, reversed in part, and remanded for the entry of judgments consistent with this court's opinion.

_____
D. KELLY THOMAS, JR., JUDGE

-18-